# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1774

_____

Trone Health Services, Inc.; Reddish Pharmacy, Inc.; Jobos Pharmacy, Inc.; Oak Tree Pharmacy; Apex Pharmacy; Amrut Jal, L.L.C.

*Plaintiffs - Appellants*

v.

Express Scripts Holding Company; Express Scripts, Inc.; Express Scripts Mail Order, Inc.; Express Scripts Mail Pharmacy Service, Inc.; Does 1-20

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2020
Filed: September 4, 2020

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

SMITH, Chief Judge.

Pharmacy Benefit Managers (PBM) serve as third-party administrators of prescription drug programs sponsored by employers, governmental entities, and health plans (collectively, "plan sponsors"). They operate as middlemen between

pharmaceutical manufacturers, plan sponsors, pharmacies, and consumers—thereby negotiating drug discounts, setting drug prices, and reimbursing pharmacies. Ultimately, PBMs' decisions influence the prescription drug market.

As the nation's largest PBM, Express Scripts, Inc. (ESI) has a broad pharmacy network, including retail pharmacies and its own pharmacy service. Appellants (collectively, "the Pharmacies") are five locally-owned retail pharmacies that participate in ESI's pharmacy network. The Pharmacies filed a lawsuit—alleging breach of contract, attempted monopolization, and other claims—against ESI and its affiliates (collectively, "ESI"). ESI then filed a motion to dismiss, and the district court[1] dismissed each claim with prejudice. On appeal, the Pharmacies challenge each dismissal except for their fraud claim. For the reasons discussed herein, we affirm.

## I. *Background*

ESI administers prescription drug coverage benefits for healthcare plan sponsors. It also contracts with the Pharmacies to fill and dispense various beneficiaries' drug prescriptions. Once the Pharmacies dispense drugs to these beneficiaries, i.e., their customers, ESI reimburses the Pharmacies for dispensing the prescriptions. Before actually filling and dispensing the prescriptions, the Pharmacies are required to submit detailed claims to ESI for processing and reimbursement. These submissions include sensitive customer and prescription information. That information consists of "the customer's identity, address, and insurer, the medication prescribed, the prescribing doctor, the quantity . . . and the dosage prescribed[,] . . . . the patient's mailing address[,] and the number of refills authorized by the prescription." J.A., Vol. I, at A-15.

---

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

The Pharmacies claim that ESI does not need all of the information it requires them to supply for confirmation of their customers' coverage and for reimbursement. They contend that ESI, instead, requests certain information, such as the number of authorized refills, and uses that information for its own commercial benefit. Specifically, the Pharmacies argue that ESI seeks the information to monopolize the market by "forcibly switch[ing] customers from [the Pharmacies'] . . . to [ESI's] own mail-based pharmacies without [the Pharmacies'] or their customers' authorization." *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, No. 4:18-CV-467 RLW, 2019 WL 1207866, at *1 (E.D. Mo. Mar. 14, 2019).

Against this backdrop, the Pharmacies initiated the instant lawsuit against ESI. They alleged six causes of action that are relevant to this appeal: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unfair competition, (4) trade secret misappropriation, (5) tortious interference with a prospective economic advantage, and (6) attempted monopolization. The district court granted ESI's motion to dismiss and dismissed the entire complaint with prejudice.

In dismissing the complaint, the district court held that the Pharmacies did not state a claim for breach of contract because their claim was based on the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Health Information Technology for Economic and Clinical Health (HITECH) Act. The parties had incorporated HIPAA and the HITECH Act into § 5.3 of their pharmacy provider agreements (PPA). The court stated that, even under a contract-related claim, HIPAA does not provide a private cause of action and that only the customers, and not the Pharmacies, can authorize the use of their information. *See id.* at *3 (stating that "a valid authorization under HIPAA must contain the 'signature of the individual and date'"(quoting 45 C.F.R. § 164.508(c)(1)(vi))).

Based on the pleadings and exhibits, the district court also held that ESI's provider manual and the parties' PPAs constitute the full agreements between the parties and that these agreements allow ESI to refill mail-order pharmacy prescriptions for the Pharmacies' customers. Because the agreements permit ESI to refill prescriptions through mail order, the court concluded that the Pharmacies did not state a claim for breach of the implied covenant of good faith and fair dealing.

Consistent with its analysis for the contract-related claims, the district court held that the Pharmacies failed to allege claims for unfair competition, trade secret misappropriation, and tortious interference. The court also dismissed the Pharmacies' attempted-monopolization claim: it determined that the Pharmacies did not plead the required element of a relevant market. In addition, the court concluded that the Pharmacies did not assert "anticompetitive or predatory conduct from which a specific intent to achieve monopoly power can be inferred, or a requisite antitrust injury from said conduct." *Id.* at *6.

In its dismissal motion, ESI also argued that the Pharmacies did not specifically allege any claim against ESI's affiliates: (1) Express Scripts Holding Co.; (2) Express Scripts Mail Order, Inc.; and (3) Express Scripts Mail Pharmacy Service, Inc. The Pharmacies asserted, in response, that group pleading is appropriate for this case. In concluding its judgment, the district court dismissed the claims against ESI's affiliates because it had dismissed all other claims in the case. Afterward, the Pharmacies filed this timely appeal.

II. *Discussion*

A. *Standard of Review*

"We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss, accepting the facts alleged in the complaint as true." *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 726 (8th Cir. 2017). Here, we also draw all reasonable inferences in favor of the Pharmacies. *See Park Irmat Drug Corp. v.*

*Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018). "Dismissal is proper where the [Pharmacies'] complaint fails 'to state a claim upon which relief can be granted.'" *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) (quoting Fed. R. Civ. P. 12(b)(6)). Additionally, "[w]e assess [the] plausibility [of the Pharmacies' complaint by] considering only the materials that are necessarily embraced by the pleadings and exhibits attached to the complaint." *Park Irmat*, 911 F.3d at 512 (internal quotations omitted).

### B. *Contract-Related Claims*
#### 1. *Breach of Contract*

The Pharmacies allege that ESI breached § 5.3 of their PPAs. That section states:

> ESI shall and Provider shall, and shall cause its Pharmacies to, comply with all federal and state laws, rules and regulations regarding the confidentiality of patient information, including, but not limited to, compliance with . . . HIPAA and the . . . HITECH Act, including all applicable rules, regulations and official guidance promulgated, in connection with HIPAA and the HITECH Act . . . .

J.A., Vol. II, at A-68. The Pharmacies contend that the district court dismissed their claim on the "erroneous ground that, because HIPAA and the HI-TECH Act do not provide [them] with private rights of action, [the Pharmacies] have no standing to sue ESI for breaching contractual provisions that prohibit it from violating those and other laws." Appellants' Br. at 11.

-5-

The Pharmacies also ask us to reverse the district court because they "are not suing under HIPAA[2] . . . and are not asserting private rights of action under th[at] law[]." *Id.* They insist that they have standing to sue and enforce their contractual rights, or legally protected interests, which flow from § 5.3 of their PPAs. The Pharmacies maintain that ESI is using their confidential customer information without authorization to switch their customers to ESI's own mail-order service when ESI should only use the information to confirm customers' coverage and to reimburse the Pharmacies.[3] Finally, they urge us to disregard the court's alternative reasoning: that HIPAA only allows the Pharmacies' customers, not the Pharmacies, to authorize the use of their confidential health information.

ESI counters that even assuming the Pharmacies could state a claim under HIPAA, the Pharmacies failed to plead sufficient facts demonstrating a past or an

---

[2]From this point forward, our reference to HIPAA also includes a reference to the HITECH Act.

[3]Specifically, the Pharmacies contend that ESI has violated two provisions of HIPAA, which can be pursued and enforced under their contract claim. In violation of 45 C.F.R. § 164.504(g)(2), the Pharmacies first claim that ESI, as a clearinghouse, legally receives the Pharmacies' customer information to process and reimburse the Pharmacies' claims. But as a healthcare service provider, the Pharmacies allege that ESI illegally converts the information to steal the Pharmacies' customers upon refilling the customers' prescriptions. *See id.* § 164.504(g)(2) ("A covered entity that performs multiple covered functions may use . . . the protected health information of individuals who receive the covered entity's health plan or health care provider services, but not both, only for purposes related to the appropriate function being performed."). Based on this same conduct, the Pharmacies aver that ESI continues to blatantly violate the general rule found in 45 C.F.R. § 164.508(a)(1), which provides, "A covered entity may not use . . . protected health information without an authorization that is valid . . . . When a covered entity obtains or receives a valid authorization for its use . . . of protected health information, such use . . . must be consistent with such authorization."

ongoing HIPAA violation. It maintains, however, that the Pharmacies do not have rights to enforce HIPAA. Furthermore, ESI contends that its HIPAA compliance is statutorily mandated and is a legal duty that preexists the parties' contractual agreements.

Under Missouri law, "the complaining party must establish the existence of a valid contract, . . . a breach by defendant, and damages resulting from the breach." *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (internal quotation omitted). Here, the parties dispute only the breach element.

As the district court stated, we have recognized that "HIPAA does not create a private right of action" as an underlying basis for a civil suit. *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010). But we have yet to address whether HIPAA's lack of a private right of action bars a plaintiff's state-law, breach-of-contract claim where (1) a contract has incorporated HIPAA by reference and (2) the plaintiff is not an actual patient, beneficiary, or customer asserting that a defendant committed a misuse violation of his protected health information.

The Pharmacies cite numerous cases for the proposition that "federal statutes can supply the standards of conduct or legal duties whose breaches form the basis for state common law claims even when those federal statutes do not themselves permit any private right of action." Appellants' Br. at 15 (citing *Hofbauer v. Nw. Nat. Bank of Rochester*, 700 F.2d 1197, 1199 (8th Cir. 1983); *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291 (8th Cir. 1980)).[4]

---

[4]The Pharmacies also cite several other cases. *See* Appellants' Br. at 12–14 (citing *Bukowski v. Wells Fargo Bank, N.A.*, 757 F. App'x 124, 128 (3d Cir. 2018) ("That [the Home Affordable Modification Program] does not provide a private cause of action, however, does not mean that it precludes state law claims altogether."); *Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861, 864 (5th Cir. 2013)

Neither *Hofbauer* nor *Iconco* addressed HIPAA specifically, but they do provide relevant analysis. In *Hofbauer*, we concluded that the National Flood Insurance Act (NFIA) does not expressly or implicitly create a federal right of action but determined that its absence did not bar the NFIA from "creat[ing] a standard of conduct which, if broken, would give rise to an action for common-law negligence." 700 F.2d at 1201. When deciding *Hofbauer*, we cited *Iconco*, where we had, three years prior, held that the federal Small Business Act—which did not provide a right to sue—could serve as the underlying basis for state claims of fraud and unjust enrichment. *Id.* (citing *Iconco*, 622 F.2d at 1296). Upon our review, *Hofbauer* and *Iconco* are consistent with similar cases decided by our sister circuits.[5] Based on our circuit precedent, we conclude that the district court erred in dismissing the

_____

("Federal statutes and regulations can form the basis of a breach-of-contract claim if the parties expressly incorporate them into their contract."); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 654 (7th Cir. 2015) ("The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law. To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012)); *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 536 (8th Cir. 2015) (deciding that licensees—as parties to contract—had standing to sue for breach of contract); *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1132 (11th Cir. 2014) (recognizing that the contractual terms referencing the Department of Housing and Urban Development regulations, which do not provide for a federal private right of action, as conditions precedent, can serve as the basis for a breach-of-contract action); *In re: Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2017 WL 539578, at *15 (D. Or. Feb. 9, 2017) ("The fact that there is no private right of action under HIPAA, however, does not preclude causes of action under state law, even if such a cause of action requires as an element that HIPAA was violated.")).

[5]*See supra* n.3.

Pharmacies' breach-of-contract claim on the basis that HIPAA lacks a private cause of action.

In addition, the Pharmacies state it is irrelevant that HIPAA does not confer upon them "the right to direct or control ESI's use of [the customers'] private information and data." Appellants' Br. at 18 (citing *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959–61 (8th Cir. 2011) (holding that ABF possessed a legally protected interest in enforcing its contract with the bargaining unit although ABF was not an actual party to the multi-employer, collective-bargaining agreement that ABF alleged was violated)). Does HIPAA permit the Pharmacies to control the use of their customers' information? The district court concluded—and ESI asserts—that it does not. If the Pharmacies lack this ability under HIPAA, they have no rights to enforce HIPAA. We agree that, textually, HIPAA does not authorize the Pharmacies to direct or control the use of their customers' information and does not grant the Pharmacies power to enforce their customers' rights. But our analysis does not end there.

We also agree that the Pharmacies failed to allege a breach of contract based upon an alleged past or ongoing HIPAA violation. The Pharmacies alleged in their complaint that ESI uses their confidential customer information without authorization from the customers themselves, who have the right to direct the use of their own information, which—according to the Pharmacies—implies a HIPAA violation. But this is not enough to support a breach-of-contract claim alleging that ESI forcibly steals the Pharmacies' customers by refilling the customers' prescriptions without the authority to do so. It is undisputed that ESI's "authorization" to collect and use the Pharmacies' customers' HIPAA-protected information in administering the filling of prescriptions comes from the plan sponsors, who have a fiduciary duty to act in the best interests of the Pharmacies' customers. *See* Compl. at 6–7, ¶¶ 21–26, *Trone*

*Health Servs., Inc. v. Express Scripts Holding Co.*, No. 4:18-cv-00467-RLW (E.D. Mo. Mar. 28, 2018), ECF No. 1.

The Pharmacies failed to allege that ESI's use of their customers' HIPAA-protected information to provide lower cost mail order refills lacked the express authorization of the plan sponsors and, thus, the implied authorization of the customers seeking to have their prescription costs covered by their plans.[6] Without the requisite "facial plausibility" demonstrating the Pharmacies' contract claim, we cannot "draw the reasonable inference that . . . [ESI] is liable for the [breach] alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## 2. *Breach of the Implied Covenant*

In addition to their breach-of-contract claim, the Pharmacies also sued for breach of the implied covenant of good faith and fair dealing. The Pharmacies contend that the district court erred in concluding that the parties' agreements allow ESI to refill their customers' prescriptions. They assert that their PPAs contain no express provision permitting ESI to transfer the prescriptions of the Pharmacies' customers to its own mail-order pharmacy. They further argue that the first "Recital" is the only portion of their PPAs that references mail order and that this "Recital does not say that ESI or its affiliates own or operate their own mail order pharmacies."

---

[6]Aside from complaining about the lack of an opportunity to amend their complaint if they failed to plead sufficient factual allegations supporting a breach-of-contract claim, the Pharmacies also contend that the district court's order did not address the sufficiency of their factual allegations regarding their breach-of-contract claim. *See* Appellants' Reply Br. at 2–3. Even accepting the Pharmacies' argument as true, "we may affirm the district court on any basis that is supported by the record." *McCrary v. Stifel, Nicolaus & Co.*, 687 F.3d 1052, 1058 (8th Cir. 2012) (cleaned up).

-10-

Appellants' Br. at 23. They insist that their implied-covenant claim should survive ESI's dismissal motion because the contract does not expressly permit ESI's conduct.

The Pharmacies also claim that the district court erred by dismissing their claim based on a misconstruction of an ambiguous provision of the parties' agreements—§ 2.4 of the provider manual. Specifically, the Pharmacies argue that the court erred when it found that ESI owns the Pharmacies' customer information upon claim submissions. According to the Pharmacies, "[s]ection 2.4 of the [Network Provider Manual] distinguishes between (1) the 'claims submitted by' [the Pharmacies] and (2) the information ESI obtains through the administration and processing of those claims." *Id.* at 26 (quoting J.A., Vol. II, at A-92). The Pharmacies state that the plain meaning of § 2.4 provides ESI with "ownership of information it obtains when administering and processing [the Pharmacies'] claims." *Id.* This only includes information such as a customer's "eligibility for coverage, the co-pay owed by the [customer] and restrictions on the [customer's] prescriptions." *Id.* at 27. The Pharmacies allege that the information extends no further.

ESI disputes the Pharmacies' interpretation of their agreements. ESI asserts that it cannot breach the implied covenant of good faith and fair dealing when the parties' agreements expressly permit the conduct that is being challenged by the Pharmacies. It requests that we affirm the district court's dismissal because the Pharmacies have failed to plead or argue that its actions have exceeded the terms of their agreements.

As determined by the district court and not disputed on appeal, the parties full agreements consist of their PPAs and ESI's provider manual. *See* J.A., Vol. II, at A-58 ("1.13 'Provider Manual' shall mean the written handbook describing the practices, rules, operational requirements and policies and procedures established by ESI for Provider (and its Pharmacies) regarding their provision of Covered Medications to Members." (bold omitted)); *id.* at A-69 ("7.3 Entire Agreement. This

-11-

[PPA], including . . . [the] Provider Manual, . . . constitutes the entire agreement of the parties with respect to the subject matter herein . . . ." (bold and underline omitted)).

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Kmak v. Am. Century Cos., Inc.*, 754 F.3d 513, 516 (8th Cir. 2014) (quoting *Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. 1998) (en banc)).

> To establish a breach of the covenant of good faith and fair dealing, "the plaintiff has the burden to establish that the defendant 'exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the plaintiff] the expected benefit of the contract.'"

*Id.* (alteration in original) (quoting *Lucero*, 400 S.W.3d at 9–10). However, "when there has been 'no subterfuge,' and the contract's 'express terms' allowed for the challenged action, there is no bad faith and thus no breach of the implied covenant." *CitiMortgage, Inc. v. Chi. Bancorp, Inc.*, 808 F.3d 747, 752 (8th Cir. 2015) (quoting *The Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co.*, 464 S.W.3d 177, 185 (Mo. 2015) (en banc)).

Here, the district court properly determined the intent of the parties by interpreting their unambiguous agreements. *See id.* at 751 ("Missouri courts interpret a contract to give effect to the parties' intent and, when a contract is unambiguous, intent 'is discerned solely from the contract's language.'" (quoting *The Arbors*, 464 S.W.3d at 183)). We agree that the parties' agreements permit ESI, through its own mail-order service, to dispense the pre-authorized refills of their plan sponsors' members, i.e, the Pharmacies' customers. Therefore, we reject the Pharmacies' arguments otherwise.

The operative provisions of the parties' agreements include the first recital and § 2.8 of the PPAs and § 2.4 of the provider manual. The first recital states, "WHEREAS, ESI administers and manages Prescription Drug Programs for its Sponsors . . . , which programs include claims administration, *mail service dispensing* and other pharmacy benefit management services . . . ." J.A., Vol. II, at A-57 (emphasis added). Next, § 2.8 of the PPAs requires the Pharmacies "to, cooperate with ESI, including providing to ESI any and all information requested by ESI necessary for coordinating any benefits provided to any Member." *Id.* at A-61.

By the plain language of the agreements, the Pharmacies agreed to cooperate with ESI for the coordination of their customers' benefits. Likewise, the district court properly concluded that "[m]ail service dispensing falls within the category of 'any benefit[s] provided to any Member.'" *Trone Health*, 2019 WL 1207866, at *4 (quoting J.A., Vol. II, at A-61). The agreements authorize ESI to administer or manage prescription drug benefits, including mail-order service dispensing—which can be interpreted to "include[] the filling of [customers'] prescriptions through [ESI's] own mail order pharmacy." *Id.* And the Pharmacies' contention that the court applied "the wrong definition of the word 'administer'" is unavailing. Appellants' Br. at 24.

The provider manual, under § 2.4, sheds light on ESI's right to use the Pharmacies' customer information. It provides, "ESI is the owner of all information it obtains through the administration and processing of any and all pharmacy claims submitted by Network Provider." J.A., Vol. II, at A-92. The Pharmacies argue that ESI does not own or control the sensitive customer information submitted to ESI but, instead, only owns the information that ESI obtains *after* processing claims.

The district court determined that "ESI obtains the information from [the Pharmacies] to administer and process pharmacy claims and that information, per the

Provider Manual, is under ESI's control. Moreover, the Provider Manual includes no language precluding ESI from using the customer information independent of ESI's relationship with [the Pharmacies]." *Trone Health*, 2019 WL 1207866, at *5. We agree with the court's construction of the contract. We have previously noted that "the implied duty of good faith and fair dealing does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 915 (8th Cir. 2007) (internal quotation omitted) (applying Missouri law).

The Pharmacies have not shown that ESI's actions have "evade[d] the spirit" of their agreements. *Kmak*, 754 F.3d at 516. The parties' agreements give ESI access to the Pharmacies' customer information and do not prevent its use for mail-order service dispensing. Thus, the district court did not err in dismissing the Pharmacies' claim for breach of the implied covenant of good faith and fair dealing.

C. *Unfair Competition and Trade Secret Misappropriation*

The Pharmacies combine their state-law claims for unfair competition and trade secret misappropriation and, in essence, assert that their unfair competition claim is founded on ESI's alleged misuse of the Pharmacies' trade secrets. They maintain that ESI shared the Pharmacies' trade secrets with its affiliates in order to steal the Pharmacies' customers and that the district court's dismissal of their claims was based "on its erroneous construction of the parties' contracts." Appellants' Br. at 33. The Pharmacies state that ESI does not own the sensitive customer information that they submit to ESI and that such "data and information [are] painstakingly developed and compiled by [them] at considerable effort and expense"—which qualifies the information as the Pharmacies' trade secrets that should be afforded legal protection. *Id.* Conversely, ESI asserts that the Pharmacies' theory—"ESI's use of information provided under the Agreements amounts to a misappropriation of the Pharmacies'

trade secrets"—fails because its conduct is consistent with the terms of their agreements. Appellees' Br. at 30.

To demonstrate unfair competition and misappropriation of trade secrets, the Pharmacies' factual allegations must show "1) the existence of . . . trade secret[s], 2) the communication of the trade secret[s] to another, . . . and 3) the use of the trade secret[s] that damaged [the Pharmacies]." *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 818 (8th Cir. 2004) (applying Missouri law). "Missouri courts have described the tort [of unfair competition] as a 'reaffirmation of the rule of fair play' and a protection against companies deceiving the public." *Tension Envelope Corp. v. JBM Envelope Co.*, 876 F.3d 1112, 1121 (8th Cir. 2017) (citing *Cushman v. Mutton Hollow Land Dev., Inc.*, 782 S.W.2d 150, 157–59 (Mo. Ct. App. 1990)).

"A trade secret can be any . . . compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Brown v. Rollet Bros. Trucking Co.*, 291 S.W.3d 766, 776 (Mo. Ct. App. 2009) (internal quotations omitted). To determine whether information is actually a trade secret, courts consider factors such as "the extent to which the information is known outside of [plaintiff's] business; . . . the amount of effort or money expended by [plaintiff] in developing the information; [and] . . . the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* (internal quotation omitted).

Missouri courts recognize customer lists as "protectable . . . trade secrets only when they represent a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it." *Id.* at 777 (internal quotation omitted). The Pharmacies state that they compile the following: customer identity; mailing address; insurer; prescribing doctor; and

-15-

prescribed medication, dosage, quantity, and number of refills. They contend that this compilation of customer information is developed at great expense, time, and effort.

The Pharmacies' arguments for trade secret protection are unpersuasive. The district court concluded that the parties' agreements provided ESI access to the alleged trade secret information and did not forbid ESI from using it for mail-order service dispensing. Hence, the court did not err in dismissing the Pharmacies' unfair competition and trade-secret claims.

## D. *Tortious Interference*

Next, the Pharmacies argue that the parties' agreements do not authorize or permit ESI to refill the Pharmacies' customers' prescriptions through its own mail-order service. Therefore, the Pharmacies claim that ESI tortiously interfered with their business expectancy that customers will allow them, rather than ESI, to dispense their pre-authorized refills.

In support of a claim for tortious interference with a business expectancy, the Pharmacies are required to show "(1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages."[7] *Rail Switching Servs., Inc. v. Marquis-Mo. Terminal, LLC*, 533 S.W.3d 245, 259 (Mo. Ct. App. 2017) (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 250 (Mo. 2006) (en banc)). "[I]n all cases where the defendant has a legitimate interest, economic or otherwise, in the . . . expectancy sought to be protected, then the [Pharmacies] must show that . . . [ESI] used improper means to interfere." *Id.* at 258.

---

[7]The Pharmacies state the claim as tortious interference with a prospective economic advantage. Missouri courts phrase the claim as tortious interference with a business expectancy.

After examining the allegations and considering the parties' agreements in their entirety, we reiterate that the parties' agreements contemplate ESI providing mail-order servicing to its plan sponsors' members, i.e., the Pharmacies' customers. Given the language of the agreements permitting ESI to provide mail-order servicing, the Pharmacies' business expectancy of exclusivity in mail-order servicing is invalid, and the district court did not err in dismissing the Pharmacies' tortious-interference claim.

E. *Attempted Monopolization*

Additionally, the Pharmacies claim that the district court's reasons and ESI's arguments for dismissing their attempted-monopolization claim are not justified. The Pharmacies posit that they alleged in their complaint "a relevant market consisting of maintenance medications paid for by ESI's insurance company customers." Appellants' Br. at 29. They assert that the relevant market "must be measured by the alternatives available to *buyers*, (i.e., patients)" and that it should not be defined to include prescription payments from uninsured customers or other plan sponsors that do not contract with ESI. *Id.* (bold omitted). According to the Pharmacies, their customers—whose health plans contract with ESI—do not have any other options but to accept ESI's refill orders against their will.

The district court properly dismissed the Pharmacies' attempted-monopolization claim. *See* 15 U.S.C. § 2 (stating that it is illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States").[8] "To establish an attempted monopolization claim under the Sherman Act, a plaintiff must prove: (1) a specific intent by the defendant to control

---

[8]"The Missouri Antitrust Law, Sec. 416.031 RSMo 1986, is construed in harmony with ruling judicial interpretations of comparable federal statutes." *Stensto v. Sunset Mem'l Park, Inc.*, 759 S.W.2d 261, 266 (Mo. Ct. App. 1988) (citing Mo. Rev. Stat. § 416.031).

prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (internal quotation omitted). "Dangerous probability of success is examined by reference to the offender's share of the relevant market." *Id.* at 550 (internal quotation omitted). A relevant market breaks down into (1) "a product market and [(2)] a geographic market." *Id.* at 547. And we have noted that a "relevant product market," which is at dispute here, has to "include[] all reasonably interchangeable products." *Park Irmat*, 911 F.3d at 517 (internal quotation omitted).

In *Park Irmat*, ESI asked the district court to dismiss the appellant's complaint, which included an attempted-monopolization claim. Park Irmat claimed that the relevant product market for its attempted-monopolization claim consisted of the "mail-order pharmacy services to Express Scripts members—a submarket made up of only Express Scripts's services within the broader market of all mail-order pharmacy services." *Id.* We affirmed the court's dismissal of the attempted-monopolization claim while concluding that Park Irmat's alleged product market was too narrowly defined. *Id.*

Here, the Pharmacies allege a similar relevant product market as that found in *Park Irmat*—maintenance medications paid for by ESI's plan sponsors. We, again, hold that this product market is too narrowly defined. That is to say, it does not include all interchangeable payment options to the Pharmacies.[9] These options

---

[9]Park Irmat's § 2 or attempted-monopolization claim was that ESI "exclude[d] mail-order pharmacies from its PBM network." *Park Irmat*, 911 F.3d at 517. Here, unlike in *Park Irmat*, the Pharmacies' attempted-monopolization claim is that ESI excludes them from competing in the "aftermarket," which is the refilling of prescriptions paid for by ESI members, i.e., the plan sponsors. Based on *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, we recognize that the "aftermarket" in this case

include medication payments from uninsured customers and PBMs other than ESI. *See, e.g.*, *id.*; *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597–98 (8th Cir. 2009) (rejecting appellant's argument "that the product market should be limited to patients using private insurance because private insurance and government insurance—the other primary method of payment—are not reasonably interchangeable").

In *Little Rock Cardiology Clinic*, we stated that "[t]he trouble with [appellant's] theory is that it analyzes the issue from the wrong side of the transaction . . . . [It] is not about the options available to patients[;] it is about the options available to shut-out cardiologists." 591 F.3d at 597. There, "[w]e conclude[d] that, as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller." *Id.* at 598. The same holds true in this case.

Accordingly, it is not necessary for us to analyze the Pharmacies' remaining arguments in support of its attempted-monopolization claim. *See id.* at 596 ("Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."). The Pharmacies did not plead sufficient facts to meet their "burden of alleging a relevant market in order to state a plausible antitrust claim." *Id.*

---

can serve as a separate market in which ESI could potentially hold sufficient monopoly power. 504 U.S. 451, 482 (1992) ("This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market."). But as we highlighted in our analysis, we reject the Pharmacies' alleged relevant market here, i.e., the "aftermarket," on the basis of its inadequate product market description, which does not include all of the Pharmacies' interchangeable payment options.

## F. *ESI's Affiliates*

Lastly, the Pharmacies note that the district court did not separately dismiss their claims against ESI's affiliates. Thus, they contend that if any claims against ESI are reversed, then those claims should be reinstated against ESI's affiliates as well. Because we affirm the district court's dismissal of the Pharmacies' complaint in its entirety, all claims against ESI's affiliates remain dismissed.

## III. *Conclusion*

In conclusion, we affirm the district court's judgment.

———————————————————